1

Darrell W. Clark, Esq.
Stinson Morrison Hecker LLP
1150 18th Street, NW
Suite 800
Washington, DC 20036-3816
Telephone (202) 785-9100
Facsimile (202) 785-9163
*Counsel for Verizon Business Global LLC*

ORIGINAL
FILED
JUN 30 2009
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

FILED
JUN 1 8 2009
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

2
3
4
5

Lisa Greer Quateman (SBN 84582)
Quateman LLP
1801 Century Park East, Suite 1801
Suite 1801
Los Angeles, CA 90067
Telephone (310) 556-1801
Facsimile (310) 556-1802

6
7
8
9
10

*Local Counsel for Verizon Business Global LLC*

11

UNITED STATES BANKRUPTCY COURT

12

CENTRAL DISTRICT OF CALIFORNIA

13

SAN FERNANDO VALLEY DIVISION

14

15

In re:

16

17

INTERNET IN A MALL,

18

Debtor.

19

20

21

22

) Case No.: SV 97-12313-GM
)
) Chapter 7
)
) **MOTION FOR ORDER RELEASING**
) **UNCLAIMED FUNDS; AFFIDAVIT OF**
) **WILLIAM M. VERMETTE**
)
) (No Hearing Required)
)
)
)
)

23
24
25
26
27
28

1    Verizon Business Global LLC ("Verizon Business") hereby submits this Motion for

2  Release of Unclaimed Funds as follows:

3    1.    In this Motion Verizon Business seeks release of $74,395.46, which is the sum of

4  all monies deposited with the court on February 28, 2006, on behalf of the creditor Gridnet

5  International, Inc. ("Gridnet"), on claim number 337 (the "Unclaimed Funds").

6    2.    Verizon Business is the successor to Gridnet.  As the successor, Verizon Business

7  is entitled to the Unclaimed Funds.

8    3.    Verizon Business is a wholly-owned subsidiary of Verizon Communications and

9  is located at 22001 Loudoun County Parkway, Ashburn, VA 20147.

10    4.    Attached hereto is an affidavit of William M. Vermette, Esq., Assistant General

11  Counsel of Verizon Business.  The Affidavit provides a history of the creditor and attaches

12  documents establishing Verizon Business's entitlement to the Unclaimed Funds as the successor

13  to Gridnet.

14    5.    Verizon Business has agreed to pay The Financial Resources Group, Inc., a 15%

15  fee on its recoveries on this matter.

16    6.    Title 28 U.S.C. 2041 sets forth the procedure for return of unclaimed funds.  This

17  Motion and accompanying Affidavit provide sufficient support to release the Unclaimed Funds.

18    7.    Delivery of the Unclaimed Funds shall be made to:

19        Verizon Business Global LLC, TIN02-0763670
          Attn. William M. Vermette, Esq.
20        22001 Loudoun County Parkway, E1-3-602
          Ashburn, VA 20147
21

22

23

24

25

26

27

28

1    WHEREFORE, Verizon Business Global LLC respectfully requests that this Court order:

2   a.   the release of the Unclaimed Funds owed to Gridnet International, Inc. in the

3 amount of $74,395.46 to Verizon Business Global LLC; and

4   b.   for such other and further relief as is just and proper.

5

6 Dated: June 18, 2009         Respectfully submitted:

7                  Darrell W. Clark, Esq.
                   Stinson Morrison Hecker LLP

8
                   Lisa Greer Quateman, Esq.

9                  Quateman LLP

10

11               By:_____
                   Lisa Greer Quateman

12                 Attorneys for Verizon Business Global LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
(San Fernando Valley Division)

| | | |
|---|---|---|
| In re: | ) | Case No. SV 97-12313 GM |
| | ) | Chapter 7 |
| INTERNET IN A MALL, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## AFFIDAVIT OF WILLIAM M. VERMETTE IN SUPPORT OF MOTION FOR ORDER RELEASING UNCLAIMED FUNDS

1.    My name is William M. Vermette. My title is Assistant General Counsel, Verizon Business Global LLC ("Verizon Business").

2.    I make this affidavit based upon my personal knowledge of the facts set forth herein.

3.    In this Affidavit, I set forth the chronology of events that result in the entitlement of Verizon Business to the Gridnet International, Inc. ("Gridnet") unclaimed funds pursuant to Claim Number 337 (the "Unclaimed Funds"). That chronology begins with the Chapter 11 bankruptcy of WorldCom, Inc. ("WorldCom"), a predecessor to Verizon Business.

4.    Gridnet is the claimant to whom the Unclaimed Funds were issued. Prior to the filing of this case, Gridnet was acquired by WorldCom and operated as WorldCom Advanced Network Solutions ("WANS"). WorldCom then merged WANS into its wholly-owned subsidiary, UUNET, in 1998.

5.    Between July 21, 2002 and November 8, 2002, WorldCom, Inc. and approximately 221 subsidiaries, including UUNET, filed Chapter 11 bankruptcy cases in the United States Bankruptcy Court for the Southern District of New York. The cases were initially procedurally consolidated under Case Number 02-13533 ("WorldCom Case").

DB04/048629.0271/1498704.1 DD02

6.    In October 2003, the Court in the WorldCom Case issued Findings of Fact and

Conclusions of Law.  In that decision, the Court substantively consolidated all 221 subsidiaries

into two groups:  the "WorldCom Subsidiaries" and the "Intermedia Subsidiaries."  *See* Findings

of Fact and Conclusions of Law, attached hereto as Exhibit A.

7.    In April, 2004, upon the effective date of WorldCom's Chapter 11 Plan of

Reorganization ("Plan"), the WorldCom Subsidiaries and the Intermedia Subsidiaries were

merged into one company that was reincorporated as a Delaware corporation known as "MCI,

Inc."  Pursuant to 11 U.S.C. § 1123 and § 5.05(d) of the Plan, those mergers required no state or

other regulatory approval.  Thus, the Plan and the accompanying Order from the U.S.

Bankruptcy Court are the best evidence of these consolidations and mergers.  *See* Plan and

Order, attached as Exhibit B and C, respectively.  *See also* Certificate of Merger, attached as

Exhibit D.

8.    Effective January, 2006, MCI, Inc., merged into Eli Acquisition, LLC, a Delaware

LLC, as part of an agreement between Verizon Communications, Inc., MCI, Inc., and Eli

Acquisition, LLC.  In that same agreement, and as of the effective date of the merger, Eli

Acquisition changed its name to MCI, LLC (a Delaware LLC).  *See* Certificate of Merger,

Merging MCI, Inc., into Eli Acquisition, LLC, attached as Exhibit E.

9.    Effective November 2006, MCI, LLC changed its name to Verizon Business

Global LLC.  *See* Certificate of Amendment of Certificate of Formation of MCI, LLC, attached

as Exhibit F.

## INTERNET IN A MALL BANKRUPTCY

10.    On February 21, 1997, Internet in a Mall filed a Chapter 11 bankruptcy petition in

the United States Bankruptcy Court for the Central District of California, Case No. 97-12313.

That case was converted to one under Chapter 7 of the Bankruptcy Code on August 26, 1997.

11.    Gridnet provided data communication, intranet, and internet services to Internet in

a Mall, pursuant to various contracts.  When Internet in a Mall's bankruptcy case was converted

to a case under Chapter 7, Internet in a Mall owed Gridnet $74,395.46 for services provided pre-

petition.

12.    Verizon Business has agreed to pay The Financial Resources Group, Inc., a 15%

fee for identifying the Unclaimed Funds.

13.    Verizon Business understands that, pursuant to 18 U.S.C. § 152, it may be fined

or imprisoned, or both, if it has knowingly and fraudulently made any false statements in this

document.

William M. Vermette, Esq.
Assistant General Counsel
Verizon Business Global LLC
22001 Loudon County Parkway
Ashburn, VA 20147

STATE OF VIRGINIA, COUNTY OF Stafford

On 4th June 2009 before me, personally appeared William M. Vermette, Assistant General
Counsel for Verizon Business Global LLC, personally known to me (or proved to me on the
basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.  WITNESS my
hand and official seal.

Notary Reg. #

Notary Public

(SEAL)

My commission expires on 10/31/12

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

In re:                                          :        Chapter 11

WORLDCOM, INC., *et al.*,                        :        Case No. 02-13533 (AJG)

                                    Debtors.     :        (Jointly Administered)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW (1) APPROVING (i) SUBSTANTIVE CONSOLIDATION AND (ii) THE SETTLEMENTS UNDER DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED OCTOBER 21, 2003, AND (2) CONFIRMNG DEBTORS' MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION, DATED OCTOBER 21, 2003

On September 8, 9, 12, 15, 16, 17 and 19, 2003 and October 14, 15, 21 and 30

2003, this Court held [1] a confirmation hearing (the "Confirmation Hearing") to consider a

plan of reorganization under chapter 11 of the Bankruptcy Code jointly proposed by

WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors

in possession (collectively, the "Debtors"). During the course of the Confirmation

Hearing, the Debtors filed Debtors' Second Amended Joint Plan of Reorganization, dated

September 12, 2003, which was subsequently modified. Debtors thereafter filed Debtors'

---

[1] This Court has subject matter jurisdiction over these cases under 28 U.S.C. §§ 157(a) and 1334(b) and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(L). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable by Fed. R. Bankr. P. 7052 and Fed. R. Bankr. P. 9014. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

Modified Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The

Bankruptcy Code, dated October 21, 2003 ("Modified Second Amended Plan").[2]

The Court has reviewed and considered the Modified Second Amended Plan, all

affidavits submitted, as well as the testimony proffered and adduced, the exhibits

admitted into evidence at the Confirmation Hearing and the arguments of counsel

presented at the Confirmation Hearing.  The Court has also considered all objections to

confirmation of the Plan.  This Court is cognizant of the compromises and settlements of

the parties, and other relevant factors affecting these Chapter 11 Cases, and takes judicial

notice of the entire record.  Based upon the following findings of fact and conclusions of

law, the Court will approve substantive consolidation, approve the settlements under the

Modified Second Amended Plan and confirm the Modified Second Amended Plan and

herein disposes of all objections to confirmation not otherwise previously resolved or

withdrawn.

## I. FINDINGS OF FACT

## A. BACKGROUND, THE PLAN, AND SOLICITATION AND NOTICE

### (i) Background

The Debtors current corporate structure results from a series of prepetition

mergers and acquisitions including that involving WorldCom, Inc. and MCI

Communications Corporation ("MCIC" and the merger with WorldCom Inc., sometimes

referred to as the "Merger").

---

[2] Capitalized terms used in this Memorandum of Decision that are not otherwise defined
herein shall have the same meanings ascribed to them in the Modified Second Amended
Plan.

2

On July 21, 2002 (the "Commencement Date") and November 8, 2002,

WorldCom, Inc. and 221 of its direct and indirect subsidiaries commenced voluntary

cases under the Bankruptcy Code.  By Orders, dated July 22, 2002 and November 12,

2002, the Debtors' Chapter 11 Cases were consolidated for procedural purposes and are

being jointly administered.  The Debtors continue to operate their businesses and manage

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  On July 29, 2002, the United States Trustee for the Southern District

of New York (the "United States Trustee") appointed the statutory committee of

unsecured creditors (the "Creditors' Committee").  No trustee has been appointed in these

Chapter 11 Cases.

On October 29, 2002 this Court entered an Order Pursuant to Bankruptcy Rule

3003(c)(3) Establishing the Deadline for Filing Certain Proofs of Claim and Approving

the Form and Manner of Notice Thereof (the "Bar Date Order").  (Docket No. 1780.)

The Bar Date Order established 5:00 p.m. (Eastern Time) on January 23, 2003 (the "Bar

Date") as the deadline for filing proofs of claims in the Debtors' cases, subject to

specified exceptions.

**(ii) The Plan**

On May 23, 2003, the Debtors filed with this Court the proposed Debtors'

Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23,

2003 (the "Disclosure Statement") and Debtors' Joint Plan of Reorganization Under

Chapter 11 of the Bankruptcy Code (the "May 23 Plan").  (Debtors' Ex. 274.)

On May 28, 2003, after due notice and a hearing held on May 19, 2003 and May

22, 2003, this Court entered an order (the "May 28 Disclosure Statement Order"), which,

among other things, approved the Disclosure Statement, finding that it contained

3

"adequate information" within the meaning of section 1125 of the Bankruptcy Code and

established procedures for the Debtors' solicitation of votes on the May 23 Plan. (Docket

No. 6110.) In accordance with the May 28 Disclosure Statement Order, on June 12, 2003

the Debtors commenced the solicitation of votes on the May 23 Plan. (Debtors' Ex. 301,

June 18, 2003 Sullivan Aff.)

On July 9, 2003, the Debtors filed with this Court the proposed Supplement to

Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated

May 23, 2003 (the "First Supplement") and Debtors' Amended Joint Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code, dated July 9, 2003 (the "July

9 Plan"). (Debtors' Ex. 273.) The modifications to the May 23 Plan embodied in the

July 9 Plan related to the incorporation of the Bank Settlement (described below) and the

creation of the corresponding Class 3A, a revision to the SEC Settlement, and the

clarification of certain implementation provisions. The First Supplement provided

disclosure with respect thereto.

On July 11, 2003, after due notice and a hearing held on July 9, 2003, this Court

entered an order (the "First Supplemental Disclosure Statement Order"), which, among

other things, approved the First Supplement, finding that the First Supplement, together

with the Disclosure Statement, contained "adequate information" within the meaning of

section 1125 of the Bankruptcy Code, established procedures for the Debtors' solicitation

of votes by holders of Claims in Class 3A and the distribution of the First Supplement

and the July 9 Plan to parties in interest, authorized any creditor to change its vote

previously cast on the May 23 Plan, and extended the deadline for filing objections to

confirmation based upon the Bank Settlement from July 28, 2003 to August 4, 2003.

4

(Docket No. 7297.)  In accordance with the First Supplemental Disclosure Statement

Order, on July 11, 2003 the Debtors commenced the solicitation of votes of holders of

Claims in Class 3A on the July 9 Plan (which amended the May 23 Plan), and

commenced the distribution of the First Supplement and July 9 Plan to parties in interest.

(Debtors' Ex. 301, July 25, 2003 Sullivan Aff.)

On July 31, 2003, the Court entered an Order: (1) Directing Debtors to File a

Second Supplement to Debtors' Disclosure Statement; (2) Setting Objection Deadline

Related Thereto; and (3) Extending Voting Deadlines and Adjourning Date for

Commencement of Confirmation Hearing (the "July 31 Order").  Pursuant to the July 31

Order, the Court directed the Debtors to file a second supplement to the Disclosure

Statement in respect of certain newly commenced governmental investigations and

actions, extended the deadline for casting votes on the Amended Plan to August 26, 2003

and adjourned the hearing to consider confirmation of the Amended Plan to September 8,

2003.  (Docket No. 7961.)

On August 6, 2003, pursuant to the July 31 Order, the Debtors filed with the

Court the proposed Second Supplement to Debtors' Disclosure Statement Pursuant to

Section 1125 of the Bankruptcy Code, dated May 23, 2003 (the "Second Supplement"),

which notified parties of the voting and objection deadlines established by the July 31

Order, provided disclosure in respect of then-recent investigations and actions by certain

governmental agencies and departments, and set forth the Debtors' position with respect

to the allegations raised thereby, the potential impact, if any, on the Debtors' estates, and

other related information.  (Debtors' Ex. 272.)

5

On August 7, 2003, after due notice and a hearing held on August 6, 2003, this
Court entered an order (the "Second Supplemental Disclosure Statement Order"), which,
among other things, approved the Second Supplement, finding that the Second
Supplement, together with the Disclosure Statement and the First Supplement, contained
"adequate information" within the meaning of section 1125 of the Bankruptcy Code,
established procedures for the Debtors' distribution of the Second Supplement to parties
in interest, authorized any creditor to change its vote previously cast on the May 23 Plan
or the Amended Plan, and extended the deadline for filing objections to confirmation
based upon the Bank Settlement from July 28, 2003 to August 4, 2003. (Docket No.
8128.) In accordance with the Second Supplemental Disclosure Statement Order, on
August 9, 2003 the Debtors commenced the distribution of the Second Supplement to
parties in interest. (Debtors' Ex. 301, August 22, 2003 Sullivan Aff.)

On August 29, 2003, the Certification of Jane Sullivan with Respect to the
Tabulation of Votes on the Plan of Reorganization, sworn to on August 29, 2003 (the
"Initial Vote Certification") was filed with the Court on behalf of the Debtors' voting and
tabulation agent, Innisfree M&A Incorporated. (Debtors' Ex. 302, Docket No. 8603.)
The July 9 Plan was accepted by holders of more than two-thirds in amount and more
than one-half in number of Claims voted in each Class entitled to vote. (Debtors' Ex.
302.)

The hearing to consider confirmation of the July 9 Plan commenced on September
8, 2003. Among the parties that had interposed objections to confirmation were the Ad
Hoc MCI Trade Claims Committee, the Ad Hoc Committee of Dissenting Bondholders,
Platinum Partners Value Arbitrage Fund, L.P. ("Platinum"), Deutsche Bank Securities,

Inc. ("Deutsche"), and HSBC Bank USA ("HSBC"). (Docket Nos. 8033, 7938, 7939, 8038, 7707, 8011.) On September 9, 2003, the Debtors informed the Court that agreements had been reached with the Ad Hoc MCI Trade Claims Committee and the Ad Hoc Committee of Dissenting Bondholders, as well as with other objectors such as Platinum, Deutsche, and HSBC, pursuant to which, among other things, the Debtors would further amend the July 9 Plan and such objections would be withdrawn.

On September 12, 2003, the Debtors filed with this Court the proposed Third Supplement to Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, dated May 23, 2003 (as thereafter modified, the "Third Supplement") and Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated September 12, 2003 (the "September 12 Plan"). (Debtors' Ex. 335.) The modifications to the July 9 Plan embodied in the September 12 Plan reflect the resolution of issues with the Ad Hoc MCI Trade Claims Committee, the Ad Hoc Committee of Dissenting Bondholders, HSBC, and other objectors such as Platinum and Deutsche that had asserted unique reliance arguments based upon their pre-merger trade claims, and include a settlement regarding the treatment of MCIC Subordinated Debt Claims, a reduction to the recovery by the holders of MCIC Senior Debt Claims, a contribution of plan consideration by the holders of MCIC Senior Debt Claims and MCIC Subordinated Debt Claims, and provision for additional recoveries to Class 6 creditors that can establish that their Claims qualify as MCI Pre-merger Claims. The Third Supplement provided disclosure with respect thereto and related provisions and addressed the extent to which (if at all) the modifications would affect creditor recoveries.

7

On September 12, 2003, after due notice by announcement of the Court on the record on September 9, 2003 and a hearing held on September 11, 2003 and September 12, 2003, this Court entered an order (the "Third Supplemental Disclosure Statement Order," and collectively with the Disclosure Statement Order, the First Supplemental Disclosure Statement Order, and the Second Supplemental Disclosure Statement Order, the "Disclosure Statement Orders"), which, among other things, approved the Third Supplement, finding that the Third Supplement, together with the Disclosure Statement, the First Supplement, and the Second Supplement, contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, established procedures for the Debtors' distribution of the Third Supplement and the September 12 Plan to parties in interest, authorized any creditor to change its vote previously cast on the May 23 Plan or the July 9 Plan and established October 8, 2003 as the deadline therefor, and established September 30, 2003 as the deadline for filing objections to confirmation based upon the modifications reflected in the September 12 Plan. (Docket No. 8893.) In accordance with the Third Supplemental Disclosure Statement Order, on September 15, 2003 the Debtors commenced the distribution of the Third Supplement and September 12 Plan to parties in interest. (Debtors' Ex. 301, September 19, 2003 Sullivan Aff.)[3]

On October 10, 2003, the Supplemental Certification of Jane Sullivan with Respect to the Tabulation of Votes on the Plan of Reorganization, sworn to on October 10, 2003 ( the "Supplemental Vote Certification," and together with the Initial Vote

---

[3] On September 19, 2003, the September 12 Plan was modified to incorporate a settlement among the Debtors, the Committee, and an Ad Hoc Committee of Intermedia Preferred Stockholders (the "Intermedia Preferred Settlement"). Notice of such modification was filed on September 24, 2003.

8

Certification, the "Vote Certifications") was filed with the Court on behalf of the

Debtors' voting and tabulation agent, Innisfree M&A Incorporated. (Debtors' Ex. 338;

Docket No. 9355.) The September 12 Plan was accepted by holders of more than two-

thirds in amount and more than one-half in number of Claims voted in each Class entitled

to vote. (Debtors' Ex. 338.)

At the October 15, 2003, the Court heard evidence and oral argument in respect of

the remaining objections to the September 12 Plan. The objectors raised various

arguments in opposition to the September 12 Plan, including that the classification of

WorldCom General Unsecured Claims, MCI Pre-merger Claims, and Ad Hoc MCI Trade

Claims Committee Claims together in one Class violated section 1123(a)(4) of the

Bankruptcy Code.

On October 20, 2003, the Court ruled concerning the objections based on section

1123(a)(4) of the Bankruptcy Code (the "October 20 Ruling"). In the October 20 Ruling,

the Court held that Class 6 of the September 12 Plan did not comply with the

requirements of section 1123(a)(4) of the Bankruptcy Code. The Court directed the

Debtors to separately classify WorldCom General Unsecured Claims, the MCI Pre-

merger Claims, and the members of the Ad Hoc MCI Trade Claims Committee.

Although the class of Ad Hoc Trade Claims receives the same treatment as the

WorldCom General Unsecured Claims under the September 12 Plan, the Court preferred

separate classification of those classes for voting purposes because of the Court's concern

that the members of the Ad Hoc Trade Claims Committee could, arguably, unduly

influence the outcome of the vote if the two groups were merged into one class. The

Court also directed that the constituency of the MCI Pre-merger Claim class would be

9

determined by a creditor election to opt into that class. Finally, the Court directed the

Debtors to advise the Court as to whether the Debtors intended to re-solicit the holders of

the newly separately-classified claims or whether the Debtors would seek to confirm the

September 12 Plan, as modified, under section 1129(b) of the Bankruptcy Code with

respect to these Classes.

In compliance with the October 20 Ruling, on October 21, 2003, the Debtors

advised the Court that they would seek confirmation of the Plan under section 1129(b) of

the Bankruptcy Code. At such time, the Court scheduled a hearing to consider

confirmation of the Plan under section 1129(b) of the Bankruptcy Code for October 30,

2003.

On October 21, 2003 the Debtors filed the Debtors' Modified Second Amended

Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October

21, 2003 (the "Modified Second Amended Plan"), which modifies the September 12 Plan

by, *inter alia*, reclassifying the Claims in former Class 6 (WorldCom General Unsecured

Claims) into Classes 6, 6A, and 6B. The Modified Second Amended Plan, thus,

separately classifies (i) into Class 6A, MCI Pre-merger Claims, which are Claims arising

solely from an individual transaction or series of transactions that was fully completed on

or before September 13, 1998, the holders of which relied on the separate credit of MCIC

or any subsidiary of MCIC as of that date, (ii) into Class 6B, solely for voting purposes,

Ad Hoc MCI Trade Claims Committee Claims, which are the General Unsecured Claims

10

of the Ad Hoc MCI Trade Claim Committee and (iii) into Class 6, all other General

Unsecured Claims against the WorldCom Debtors.[4]

Each holder of an Allowed Class 6 WorldCom General Unsecured Claim will

receive the same treatment under the Plan consisting of (i) 7.14 shares of New Common

Stock for each one thousand ($1,000) dollars of such holder's Allowed WorldCom

General Unsecured Claim and (ii) Cash in an amount equal to .1785 multiplied by the

Allowed amount of such WorldCom General Unsecured Claim. Each holder of an

Allowed Class 6A MCI Pre-merger Claim will receive the same treatment under the Plan

consisting of (i) 7.14 shares of New Common Stock for each one thousand ($1,000)

dollars of such holder's Allowed MCI Pre-merger Claim and (ii) Cash in an amount equal

to .4215 multiplied by the Allowed amount of such MCI Pre-merger Claim. The Claims

of the Ad Hoc MCI Trade Claims Committee Claims are separately classified in Class 6B

solely for voting purposes and not for treatment purposes. Holders of Claims in Class 6B

will receive the same treatment as Class 6 creditors. They will also receive additional

value from the contributions from the holders of Claims in Classes 9 and 10.

Although the original Class 6 (which included Class 6A Claims) overwhelmingly

accepted the plan, Classes 6 and 6A are deemed to have voted to reject for purposes of

seeking confirmation of the Modified Second Amended Plan pursuant to section 1129(b)

of the Bankruptcy Code. The Class 6B Ad Hoc MCI Trade Claims Committee Claims

are deemed to be an "accepting" Class because the members of the Ad Hoc MCI Trade

---

[4] As set forth by the Debtors on the record at the October 21, 2003 hearing, the other
modifications include a modification to the Exculpation Provision, which was agreed to
by the Debtors, the Committee and the United States Trustee, and conforming changes
relating to the Intermedia Preferred Settlement, none of which implicates or adversely
impacts creditor recoveries.

11

Claims Committee have agreed to the treatment and to support the Modified Second
Amended Plan pursuant to the Integrated Settlement and related stipulations.

The Modified Second Amended Plan constitutes the "Plan."

**(iii) Solicitation And Notice**

The Disclosure Statement (Debtors' Ex. 274), the First Supplement (Debtors' Ex.
273), the Second Supplement (Debtors' Ex. 272), the Third Supplement (Debtors' Ex.
335), the Plan (Debtors' Ex. 335; Docket No. 9004), the Ballots (Docket Nos. 6110,
7297, 8893), the notice of the Confirmation Hearing (Docket No. 6110), and the
Disclosure Statement Orders (Docket Nos. 6110, 7297, 8128, 8893) (as applicable, the
"Solicitation Materials") were transmitted and served in compliance with the Bankruptcy
Rules and the Disclosure Statement Orders. As described in the Affidavits of Service of
Innisfree M&A Incorporated, sworn to by Jane Sullivan on June 18, 2003, July 8, 2003,
July 25, 2003, July 30, 2003, August 22, 2003, September 19, 2003 and September 26,
2003 (each a "Sullivan Affidavit" and collectively, the "Sullivan Affidavits") (Debtors'
Ex. 301), (i) the transmittal and service of the Solicitation Materials were adequate and
sufficient under the circumstances of these Chapter 11 Cases, and (ii) adequate and
sufficient notice of the Confirmation Hearing (including the July 28, 2003, August 4,
2003, August 19, 2003, September 30, 2003 and October 27, 2003 deadlines for filing
and serving objections to confirmation) and other requirements, deadlines, hearings and
matters described in the Disclosure Statement Orders were provided in compliance with
the Bankruptcy Rules and the Disclosure Statement Orders, and no other or further notice
is required.

In addition, Debtors appropriately served Notice of Modifications to Debtors'

Second Amended Plan of Reorganization dated September 19, 2003, which among other

things, revealed that Debtors agreed to provide a 5% recovery to the holders of

Intermedia Preferred Stock and that such modification did not have an adverse effect

upon the recovery of any class of creditors. (Docket No. 9066)

The Objectors at the October 15, 2003 hearing on confirmation included America

West Airlines, Inc. ("America West"), CIT Lending Services Corporation ("CIT"), Next

Factors, Inc.[5] ("Next Factors"), the United States Trustee for the Southern District of

New York ("United States Trustee"), and Wells Fargo Bank, N.A. ("Wells Fargo").[6] The

Objector at the October 30, 2003 hearing on confirmation was Liquidity Solutions Inc

("LSI").[7]

---

[5] Next Factors' denial of receipt of the Third Supplement is insufficient to rebut the
presumption of its receipt of same. There is a rebuttable presumption that the addressee
of a properly addressed and mailed notice receives that notice. *Hagner v. United States*,
285 U.S. 427, 430 (1932). A party must do more than merely deny receipt of the
mailing; its testimony or affidavit of non-receipt is insufficient, standing alone, to rebut
the presumption. *In re Ms. Interpret*, 222 B.R. 409, 413 (Bankr. S.D.N.Y. 1998); *In re
Adler, Coleman Clearing Corp.*, 204 B.R. 99, 105 (Bankr. S.D.N.Y. 1997). The Court
has reviewed certain Assignment of Claims filed in this case and the address used by
Next Factors therein is identical to the address used by the Debtors to serve Next Factors.
Indeed, Next Factor's counsel has used that same address in his submissions with this
Court. Because Next Factors was provided with proper notification of the deadline to file
objections to the Plan and failed to file its objection by such objection deadline and
because Next Factors has failed to provide sufficient justification or excuse for such
failure, Next Factors is barred from objecting to the Second Amended Plan. In any event,
the Court believes that the Court's conclusions, as set forth in the text, are sufficient to
overrule Next Factors objections on the merits.

[6] The America West and CIT objections to confirmation of the Plan were later withdrawn
pursuant to stipulations and agreed orders between the Debtors and America West and
between the Debtors and CIT.

[7] For the reasons set forth more fully at the hearing, LSI offered no convincing excuse or
evidence for its failure to abide by the objection deadline. Moreover, the Court finds that
allowing LSI's to file an untimely objection that, inter alia, sought a continuance of the

The Disclosure Statement, the First Supplement, the Second Supplement, and the Third Supplement provide to holders of Claims against and Equity Interests in the Debtors "adequate information" within the meaning of section 1125 of the Bankruptcy Code. Votes on the Plan were solicited after disclosure to holders of Claims against and Equity Interests in the Debtors of "adequate information" as defined in section 1125 of the Bankruptcy Code. The procedures used to distribute and tabulate the Ballots were fair, properly conducted, and in accordance with the Disclosure Statement Orders and all applicable Bankruptcy Rules.

## B. SUBSTANTIVE CONSOLIDATION

The Plan provides for the substantive consolidation of the WorldCom Debtors and the separate substantive consolidation of the Intermedia Debtors. (Plan §§ 5.01, 5.02.)

### (i) The Debtors' Operations

The WorldCom enterprise is comprised of over 400 legal entities. (Debtors' Ex. 268.) Of these, 222 are debtors in these Chapter 11 Cases.

Historically, all the Debtors operated under common senior management. This has continued during the Chapter 11 Cases, with the appointment of Michael Capellas as Chairman of the Board of Directors and Chief Executive Officer for all of the Debtors. (Debtors' Ex. 202.) Debtors never prepared separate legal entity financial statements for public financial reporting purposes. (9/15/03 Tr. at 100.) The Debtors historically have done all public financial reporting on a consolidated basis. (*See, e.g.*, Debtors' Ex. 226.)

---

hearing would prejudice the Debtors at this stage of the case. The Court therefore did not have to consider its objection. Nevertheless, the Court believes that the Court's conclusions, as set forth in the text, are sufficient to overrule LSI's objections on the merits.

The Debtors likewise filed consolidated federal income tax returns. (*See, e.g.*, Debtors'
Ex. 271.)

### (ii) Transfer Of Assets From WorldCom, Inc. to MCIC

After the 1998 acquisition of, and merger with, MCIC, WorldCom substantially
restructured its corporate organization.

Through a series of restructuring transactions in December 1998, June 1999 and
September 1999, the Debtors transferred significant assets from WorldCom, Inc. to
MCIC and its subsidiaries, including the following:

- WorldCom, Inc. transferred all shares of Management Company to
  MCIC.

- WorldCom, Inc. transferred several of its direct subsidiaries into
  UUNET, an indirect legacy WorldCom subsidiary. As a result of
  this transfer, UUNET Technologies, Inc. ("UUNET") held all of
  the internet operations of the Company and UUNET's direct
  subsidiary held all of the value-added assets and operations.

- IDB WorldCom, Inc. ("IDBWC"), a direct subsidiary of
  WorldCom, Inc., and a direct subsidiary of IDBWC Inc. were
  merged with and into MCIC.

- MCIC conveyed most of the assets and employees of the former
  IDBWC and its subsidiary to other subsidiaries of MCIC.

- MFS Communications Company ("MFSCC"), a legacy WorldCom
  subsidiary, was merged with and into MCIC.

- MCIC conveyed all assets of the former MFSCC to Network
  Services but did not transfer any liabilities. This transfer resulted
  in legacy WorldCom subsidiaries that were former subsidiaries of
  MFSCC, such as UUNET, becoming indirect subsidiaries of
  Network Services.

- WorldCom conveyed its interest in WorldCom Pacific LLC to
  MCIC, and MCIC merged Pacific into MCIWC Communications.

- Network Services conveyed its sales-related assets and employees
  as well as the interconnection agreements of the former MFSCC to
  MCIWC Communications.

15

- WorldCom Network Services, Inc. ("WNS"), a legacy WorldCom subsidiary, was merged with and into Network Services.

(*See* Debtors' Exs. 33-95, 113-22, 144-65 and 331 and Creditors' Committee's Ex. 2.)

### (iii) Operational Integration of the Debtors

In furtherance of the post-merger corporate restructuring efforts, the Debtors continued and expanded operational integration of the various legal entities. Although each of the Debtors exists as a separate legal entity, WorldCom's business, both before and after the MCI merger, was and is organized along operational and functional lines rather than by legal entities. (9/15/03 Tr. at 29-30.)

Debtors are comprised of two general types of business units – sales units and operating units. (9/15/03 Tr. at 28-29.) The Debtors' sales and marketing functions are organized along three major sales channels – International, Business and Consumer. International is everything outside the United States. Business markets covers everything from small- and medium-sized businesses to the largest global account customers. Consumer, or mass markets, covers residential customers and very small businesses. (Deposition of Fred M. Briggs ("Briggs Dep.") at 80.)

The Debtors' operating units provide services and support to the sales units. The operating units include: Operations and Technology, Finance, Human Resources, Purchasing, Legal, and Marketing. (9/15/03 Tr. at 29; Declaration of Matthew Johnson ("Johnson Decl.") ¶ 1.)

Although the operations of all the Debtors are integrated, the finances of the 17 Intermedia Debtors were not integrated with those of the remaining Debtors. After the 2001 acquisition of Intermedia by WorldCom, the Intermedia Debtors continued to prepare separate financial statements, annual reports and other filings with the Securities

16

and Exchange Commission.  Those filings, however, are done on a consolidated basis for

all of the Intermedia entities.  (Debtors' Exs. 319, 320, 327.)

**(iv) Network Operations Are Integrated**

The Debtors operate a fully-integrated telecommunications network.  The

Debtors' Operations and Technology unit builds, maintains, supports, operates and

acquires network capacity on behalf of the entire enterprise without regard to separate

legal entities.  The only notable exception is the Skytel paging business, which operates a

separate network.  (Briggs Dep. at 24-25, 34-37, 91.)

The integrated network platforms, products and services provided by the

Operations and Technology unit support all three of the major sales channels and provide

network services to the entire enterprise.  (Briggs Dep. at 80, 91-92; Debtors' Exs. 121-

22.)  The costs of building, operating and maintaining the Debtors' telecommunications

network are allocated to the major sales channels for management reporting purposes.

(Briggs Dep. at 82-83.)

**(v) Procurement Operations Are Integrated**

The Debtors operate a centralized procurement department.  The purchasing

department purchased the vast majority of all capital and non-capital items that were

acquired by any of the Debtors.  (Johnson Decl. ¶ 3.)

The Debtors' centralized purchasing department performs, among others, the

following primary functions:  (a) determines that certain goods or services are needed for

the Debtors' family of companies or receives an internal request for goods or services; (b)

identifies potential vendors that could supply the good or services; (c) negotiates with

those vendors; (d) awards contracts to the winning vendors; and (e) actually buys,

through the centralized procurement department's purchase order, the goods or services needed within the Debtors' organization.  (Johnson Decl. ¶ 4.)

The centralized purchasing department does not send the purchase orders on behalf of any particular legal entity.  The Debtors' standard purchase order provides that, "This purchase is made by WorldCom Purchasing, LLC as agent for the Subsidiaries of MCI WORLDCOM, Inc."  Purchase orders did not reference the particular legal entity with which the vendor was transacting business.  (Johnson Decl. ¶ 5 & Ex. A; Debtors' Exs. 249-64.)

The centralized procurement department does not know what legal entity will receive or use the goods or services that it purchases.  As a result, the Debtors' centralized procurement department does not communicate to the vendors that any particular legal entity is acquiring the goods or services or will be financially responsible for the vendor's invoice for the goods or services.  (Johnson Decl. ¶ 6; Briggs Dep. at 44.)

The invoices vendors submit for goods or services they sold to the Debtors under a purchase order are paid by the Debtors' centralized accounts payable department – not by any particular legal entity.  The checks paying these invoices identify only the ultimate parent corporation (that is, WorldCom, Inc.).  (Johnson Decl. ¶ 7.)

Numerous trade creditors have filed exactly the same claim against multiple Debtors.  This has resulted from the creditors' inability to determine which particular Debtor is the proper entity against which a proof of claim should be filed.  Many creditors have filed the same claim against all 222 Debtors.  (Johnson Decl. ¶ 8; Debtors' Ex. 248.)

18

**(vi) Cash Management Functions Are Integrated**

The Debtors operate a centralized cash management system which handles substantially all cash received by, and paid by, all of the Debtors. The Debtors' treasury department does not manage the enterprise's cash on a legal entity basis. Rather, it tracks to bank accounts. (Deposition of Mary Chastka at 15 hereafter "Chastka Dep.")

The Debtors have several hundred bank accounts. (Chastka Dep. at 16.) There is no correlation between legal entities and bank accounts. (*Id.* at 18.)

Customer payments generally are made to lockbox accounts. The lockbox accounts are swept on a daily basis and all funds therein are transferred to the Debtors' single cash concentration account. (Chastka Dep. at 16-17, 22.)

The funds in the concentration account are then sent out to cover drafts on the Debtors' various disbursement accounts, which pay payroll expenses, vendor invoices, employee benefits and all other operational expenses of the enterprise. (Chastka Dep. at 22-23.)

Any surplus of cash in the concentration account is invested overnight in one of several money market accounts. (Chastka Dep. at 23.)

External sources of cash, such as bank borrowing, are deposited directly into the concentration account. (Chastka Dep. at 79-80.)

**(vii) Actions During the Chapter 11 Cases**

The Debtors and their major creditor constituencies, including the Creditors' Committee, appear to have recognized from the start of these Chapter 11 Cases that the ability to create separate legal entity financial statements, as well as the existence of

19

substantial intercompany claims, were important issues in connection with evaluating the
need for substantive consolidation of the estates. (9/15/03 Tr. at 217-19.)

The Creditors' Committee retained FTI Consulting Inc. ("FTI") as its forensic
accountant and charged FTI with investigating intercompany accounts, among other
things. (9/15/03 Tr. at 95-96.) The Debtors cooperated with this effort, providing
documents, access to the company's accounting systems, and access to key accounting
and financial personnel. (9/15/03 Tr. at 223-25.) FTI served as a fact-finder, sharing the
results of its investigations with the Creditors' Committee, as well as the Debtors, in a
series of reports. (Creditors' Committee's Exs. 2-4; 9/15/03 Tr. at 95, 224.)

In addition, the Debtors provided all major creditor constituencies with equal
access to financial data, establishing a data room in their Washington, DC offices where
documents and access to the Essbase financial system (described below) were available.
(9/15/03 Tr. at 223-24.)

As a result of the substantial investigations that have taken place, the Debtors'
historical accounting systems are well understood and there is an extensive record
demonstrating the many historical deficiencies that make it impossible for the Debtors to
prepare accurate and reliable separate legal entity financial statements on a historical
basis.

**(viii) The Debtors' Complex Accounting System**

The Debtors' accounting systems are very complex and not well integrated.
(9/15/03 Tr. at 30.) The Debtors have multiple ledger systems, the largest of which is
SAP (a general ledger system). There are two SAP systems – one for domestic

20

operations and one for international operations. (9/15/03 Tr. at 30-31.) These two

systems, however, did not effectively communicate. (9/15/03 Tr. at 102-03.)

In addition, some of the Debtors business units operate on a Lawson system,

while still others operate on an Oracle system. (9/15/03 Tr. at 31.) These various

systems are aggregated in a system referred to as Essbase which consolidates all of the

financial data into one system. (9/15/03 Tr. at 31.)

There are multiple accounting systems that feed these general ledgers, including

approximately sixty-five billing systems that feed the general ledger system through a

variety of processes, both automated and manual. (9/15/03 Tr. at 31-32.)

There are also twenty-three accounts receivable systems that feed the billing

systems. The accounts receivable systems also have hundreds of front-end systems (such

as order entry, provisioning, call record tracking and rating). (9/15/03 Tr. at 32.) None

of the accounts are reconciled to the general ledger. For example, the sixty-five billing

systems and the twenty-three AR systems were never reconciled at the sub ledger.

(9/15/03 Tr. at 45.)

There are approximately 20,000 general ledger accounts and sub accounts that are

used to capture transactions for specific items such as service, general and administrative

and balance sheets. (9/15/03 Tr. at 32.)

There is no specific accounting for legal entities in SAP; instead accounting is by

company code. There are more than 1,100 company codes notwithstanding that there are

only approximately 400 legal entities. (9/15/03 Tr. at 33.)

Debtors maintained their financial books on a general ledger company code basis,

not on a legal entity basis. (9/15/03 Tr. at 99.) Each company code does not represent a

21

separate legal entity as there are multiple company codes for each legal entity. In addition, there are company codes that do not represent legal entities. (9/15/03 Tr. at 33.) There exists no current accurate or complete map which ties these company codes to legal entities. (9/15/03 Tr. at 33.)

The ownership of assets, the receipt of revenues and the incurrence of expenses are accounted for in this complex accounting system. The Debtors, however, do not have records of the assets that are owned by each of the separate legal entities. (9/15/03 Tr. at 78-79.) The Debtors are unable to determine the ownership of the assets on a separate entity separate debtor basis. (9/15/03 Tr. at 138.)

**(ix) Intercompany Accounting**

Intercompany accounts are used to track transactions between related companies. There are approximately 1,400 intercompany accounts and various sub general ledger systems. The Debtors actively use approximately 300 to 320 of these accounts. (9/15/03 Tr. at 55.) Millions of transactions have flowed through these intercompany accounts and there are aggregate balances of approximately $1,000,000,000,000 (one trillion) in these accounts. (9/15/03 Tr. at 55.)

For the month of November 2002, there were over six hundred thousand transactions alone. This equates to over seven million transactions per year. (9/15/03 Tr. at 104.)

W-100 is an account counterparty in the SAP system. When the SAP system was interacting with another general ledger company code that did not have an SAP company code, the system would record the transaction in the W-100 account. The transaction in

22

W-100 reflects the transaction that should be booked in another general ledger system, such as Lawson. (9/15/03 Tr. at 112-13.)

W-100 does not represent a distinct legal entity, and where such an account was listed as the counterparty it does not provide any relevant information concerning the actual identity of the counterparty. (9/15/03 Tr. at 113.)

The Debtors never checked to see that W-100 entries were actually made in the Lawson ledgers because such a control never existed. (9/15/03 Tr. at 114.)

As of March 12, 2003, FTI, was able to identify counterparties for only about two thirds of the $1,000,000,000,000 or so of intercompany accounts. (9/15/03 Tr. at 114-15.)

From a consolidated standpoint, intercompany accounts should offset to zero in a properly functioning accounting system. The Debtors, however, never systematically balanced their intercompany accounts and the accounts therefore have a significant net out-of-balance. (9/15/03 Tr. at 55-56.)

As a basic accounting principle, the total amount of intercompany payables should equal the total amount of intercompany receivables. However, as of the Commencement Date, the sum of the receivables and payables for all of the entities did not equal zero but was out of balance by approximately $233,000,000. (9/15/03 Tr. at 108.)

At the end of 2000, the intercompany accounts, on an consolidated basis, were out of balance by a receivable amount of approximately $115,000,000. By the end of 2001, that out-of-balance had flipped and the accounts were out of balance by a payable amount of about $175,000,000. And then in June of 2002, the out-of-balance had flipped

23

again and the accounts were out of balance by a receivable of approximately

$275,000,000. (9/15/03 Tr. at 56-57.)

These are net figures in which out-of-balances on the receivables side are offset

against out-of-balances on the payables side. The actual aggregate out of balance is in

the billions of dollars. (9/15/03 Tr. at 57-58.)  Therefore, the intercompany account

balances between legal entities cannot be accurately determined.  (9/15/03 Tr. at 128.)

Without internal controls in place, the likelihood of material errors occurring is

significant.  As a result, there is no way to rely on the systems to generate accurate legal

entity information or accurate intercompany transactions information by legal entity.

(9/15/03 Tr. at 130.)

Intercompany transactions were recorded without regard for the proper general

ledger and the Debtors often failed to record significant entries in their intercompany

accounts.  (9/15/03 Tr. at 132-33.)  For example, FTI found the following three large

errors: (i) an entry for $4,300,000,000 where cash was improperly stated in a legal entity

as well as an intercompany account; (ii) an error in excess of $8,000,000,000 involving

transfer pricing entries; and (iii) an error in excess of $5,000,000,000 in which transfer

pricing charges were incorrectly recorded as an intercompany liability. (9/15/03 Tr. at

132; Creditors' Committee's Ex. 36 at 12.)  In addition, FTI also found that a billion

dollar correcting entry was never made relating to intercompany transfer pricing and that

interest was not charged on all intercompany accounts.  (9/15/03 Tr. at 133; Creditors'

Committee's Ex. 36 at 13.)

Without knowing the intercompany receivables and the intercompany payables,

the Debtors cannot prepare accurate separate legal entity financial statements as of the

24

bankruptcy filing. (9/15/03 Tr. at 135-36.) The Debtors cannot review the accuracy of

each of the underlying intercompany transactions to determine if they were appropriately

entered and charged to the correct legal entities because of a lack of documentation, lack

of personnel with institutional knowledge and improper historic controls. (9/15/03 Tr. at

60.)

As the Debtors acquired entities, performed restructurings and consolidated their

ledgers, the integrity of the intercompany accounts was impaired. (9/15/03 Tr. at 80-81.)

While lack of information regarding intercompany accounts is not a significant issue on a

consolidated basis, on a legal entity basis they could not simply be written-off because

there has to be an intercompany payable and receivable attached to specific legal entities.

(9/15/03 Tr. at 82-83.)

**(x) The Debtors Are Unable to Create Accurate or Reliable Historical Separate
Legal Entity Financial Statements**

Accurate and reliable separate entity historical financial statements cannot be

created and the data in the Debtors' financial system are an unreliable base from which to

prepare accurate separate legal entity financial statements. (9/15/03 Tr. at 135-38, 140-

42.)

All of the Debtors' current restatement efforts are focused on generating restated

financials on a consolidated basis, not on an entity-by-entity basis. (9/15/03 Tr. at 35,

41.) Virtually the entire accounting staff of the Debtors has turned over since June 2002.

Approximately 400 new professionals have been hired. (9/15/03 Tr. at 44.)

Debtors have established that it would not be possible to restate results for each

legal entity because the Debtors did not manage their business by legal entity, there was

25

never a review of financial statements by legal entity on a timely basis, there was a lack

of controls or policies in place by legal entity, no intercompany reconciliations were

performed and the work force was not trained on the importance of doing legal entity

accounting. (9/15/03 Tr. at 36, 41.) Reconstruction of legal entity books and records is

further impossible due to the lack of documentation for some transactions and the loss of

individuals with institutional knowledge. (9/15/03 Tr. at 60.)

**(xi) Lack of Historic Internal Controls**

KPMG conducted an exhaustive and detailed analysis of the Debtors' internal

accounting controls in preparation of its audit of the Debtors' 2000, 2001 and 2002

restated consolidated financial statements. (9/15/03 Tr. at 40-41; Debtors' Ex. 195.)

As a result of that analysis KPMG identified ten "material weaknesses" in the

Debtors' internal financial controls and operations which it formalized in its June 3, 2003

letter to management and which was filed by the Debtors as part of a Form 8-K on or

about June 9, 2003:

> 1.1 **The Company needs to increase the experience and depth of its
> financial management and accounting personnel.** The Company has
> several key financial management and numerous other accounting
> positions that remain vacant. These positions are critical to record,
> process, summarize and report financial data consistent with assertions of
> management in the financial statements and internal management reports.

> 1.2 **The Company needs to implement procedures and controls to review,
> monitor and maintain general ledger accounts.** Significant efforts will
> be required to implement procedures and controls to ensure the
> maintenance and integrity of the general ledger. All general ledger
> accounts should be assigned to individuals who would be responsible for
> documenting the composition of ending balances and for determining that
> activity in those accounts is appropriate. Those individuals would also be
> responsible for reconciling account balances to underlying ledgers.

> 1.3 **The Company must implement procedures to ensure that
> reconciliations between subsidiary ledgers and the general ledger are
> performed.** During our review of a substantial number of general ledger

accounts, including accounts receivable, various liability accounts and property, plant and equipment, we noted that the Company has not historically consistently reconciled the subsidiary ledgers to the general ledger. We also noted that the Company has not consistently reconciled numerous cash accounts.

1.4 **The Company's consolidation process is highly automated and extremely complex. We have found that the process is largely undocumented, and only a few individuals have a limited understanding of only certain parts of the process.**

1.5 **Significant improvement needs to be made in segregation of duties, responsibilities and management review controls.** We noted certain accounting personnel have had the ability and responsibility to post and reconcile accounts under their control without an independent review. This lack of segregation of duties allowed accounting personnel to manipulate financial information that went undetected. Additionally, procedures need to be implemented to ensure that management personnel with appropriate knowledge and understanding review reconciliations and other financial information.

1.6 **Policies, procedures and standardization of internal controls need to be implemented.** There is a severe lack of policies, procedures and standardization of operating and financial controls and a general lack of documentation related to existing controls. These basic control weaknesses allowed journal entries to be posted without adequate support and documentation. Management should develop Company-wide standards of internal control to document its commitment to compliance with applicable laws and regulations, reliable operational and financial reporting and integrity of business activities and records. Good internal controls are fundamental to the Company achieving its key initiatives and goals. Such Company-wide standards of internal control should be applicable to all subsidiaries, units, groups and departments worldwide. The standards generally should reflect control objectives and not attempt to describe specific procedures required in each business.

1.7 **The Company's operating management must be provided with appropriate financial information and appropriate procedures must be in place such that operating management is confident that financial information being used to manage their businesses is ultimately included in the Company's externally reported financial information.** In the past, the Company's process for management reporting and review limited operating management's access to financial information. This was particularly noted in revenue, line costs and property, plant and equipment. Through well defined management reporting supported by strong budget to actual analysis, together with confidence in the financial

27

reporting process, operating management can be assured that externally reported results are consistent with actual operating results.

1.8    **Review, monitoring and oversight of the global business units needs to be increased.**

1.9    **Sufficient analysis and documentation of non-routine transactions needs to occur.  Examples of non-routine transactions are derivatives and Indefeasible Rights of Use (IRUs).**  In a number of cases we noted that non-routine transactions were not identified or otherwise brought to the attention of and reviewed by accounting personnel with the appropriate level of expertise to properly analyze and account for these transactions. In addition, in some cases inappropriate accounting decisions were reached such as in the accounting for Avantel, Embratel and certain capitalized costs.  We are also informed that management had not performed an impairment analysis of its long-lived assets nor could we find documentation as to where impairment was considered or analysis performed.

1.10    **The items identified in Section 4 *Accounting Matters* require the attention of appropriate levels of financial management and must be addressed in the Company's preparation of its restated financial statements.**

(Debtors' Ex. 195.)

KPMG identified specific areas of concern under each of these broad topics which relate to the inability of the Debtors to generate accurate and reliable separate financial statements by legal entity.  For example, KPMG found that:

1.3.1    Reconciliations throughout the revenue generating process were not performed, documented or analyzed in a timely manner to ensure that the accounting records are complete and accurate.

1.3.3    A formal process had not been established to ensure that cash transfers between accounts receivable platforms were properly reconciled in both the accounts receivable subledgers and the general ledger.

1.3.12    The unapplied cash account was inappropriately used to record unreconciled differences between accounts receivable platforms and the general ledger regardless of the nature of the differences. Policies and procedures to monitor and reconcile the unapplied cash general ledger account to accounts receivable platforms and subsidiary ledgers should be developed and implemented.

28

1.4.2    Organizational and account structures in the general ledger system
(SAP) do not match the structural configuration of the
consolidation tool (Essbase). Therefore, SAP and Essbase do not
necessarily match the Company's operational legal structure as old
and non-operating or non-consolidating companies still exist in
SAP and Essbase.

1.4.3    The legal entity structure documented by the Company does not
currently match the operational legal structure within SAP and
Essbase.

1.4.4    The Company does not appear to have established or documented
policies and procedures to ensure the proper recording of
elimination journal entries.

In addition to KPMG's findings, in its Report of Investigation dated March 31,

2003, the Special Investigative Committee of the Board of Directors of WorldCom, Inc.

found that many of the accounting records were in disarray or non-existent and that

Arthur Andersen, the Debtors' predecessor auditors, did not perform any testing to justify

reliance on WorldCom's internal controls. (Debtors' Ex. 267, at 26.)

**(xii) Remediation of Internal Controls and Accounting Restatement**

The Debtors have established teams and developed plans to remediate the internal

control weaknesses identified by KPMG on a going-forward basis and have retained a

significant team of professionals from Deloitte & Touche to conduct a complete

assessment of the Debtors' internal control environment, remediate the internal control

weaknesses identified in the KPMG letter, and develop remediation plans for any other

weaknesses that may be discovered. (9/15/03 Tr. at 52.)

Developing appropriate controls on a going-forward basis, however, will not

enable the Debtors to recreate accurate and reliable separate legal entity financial

statements on a historical basis for each of the Debtors. (9/15/03 Tr. at 53.) The Debtors

do, however, intend to produce reliable, restated financial results on a consolidated basis

29

for the 2000 through 2002 time period and have devoted significant resources toward that

end. (9/15/03 Tr. at 38-40.) The Debtors have made substantial progress on the

restatement project. Most of the project teams have detailed action plans and are very

close to completing their tasks. (9/15/03 Tr. at 61.) KPMG has been auditing each area

of the restatement as it has been concluded. (9/15/03 Tr. at 38, 61.)

**(xiii) Benefits of Substantive Consolidation**

In addition to the fact that the Debtors simply are not able to produce accurate and

reliable separate legal entity financial statements on a historical basis, substantive

consolidation provides significant benefits to the creditor constituency as a whole.

WorldCom operates in a highly competitive industry. (9/15/03 Tr. at 215-16.)

There was substantial consensus among major creditor constituencies that a speedy

emergence from chapter 11 was in the best interest of the Debtors and all creditors, a

view shared by the Debtor's senior management and professionals. (9/15/03 Tr. at 215-

16, 242, 249.)

Absent substantive consolidation, there likely would be massive intercreditor

litigation regarding the validity and enforceability of intercompany claims, as well as

litigation under chapter 5 of the Bankruptcy Code regarding intercompany payments and

transfers of billion of dollars in assets that occurred in the various restructuring

transactions. (9/15/03 Tr. at 225, 254-46.) The costs attendant to litigation of these

intercreditor disputes, both in terms of out of pocket transactional costs and the

diminution of enterprise value that likely would result from a prolonged stay in chapter

11, would have a material adverse effect on all creditor recoveries and the chances of a

30

successful reorganization. (Transcript of Hearing held on September 16, 2003 ("9/16/03

Tr.") at 74-87.)

## C. THE SETTLEMENTS

The Plan incorporates and provides for three compromises and settlements (the

"Settlements") under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rule(s)") referred to as The Intermedia Settlement, The Bank Settlement

and The MCIC Settlement:

- Intermedia Settlement. This settlement resolves all issues relating

  to (a) the validity, enforceability and priority of the Intermedia

  Intercompany Note (as defined below), including certain claims

  and causes of action that WorldCom, Inc. may have to avoid the

  Intermedia Intercompany Note as a fraudulent transfer or to

  recover payments of principal and interest thereon as preferential

  transfers and (b) the transfer of certain assets of Intermedia to the

  WorldCom Debtors (the "Intermedia Settlement"). (9/16/03 Tr. at

  81-87; Plan § 5.06; Disclosure Statement at 41-49.) Under the

  Intermedia Settlement, WorldCom, Inc. will transfer

  $1,029,000,000 in value,[8] in the form of notes and stock (the

  "Intermedia Settlement Consideration"), to Intermedia in complete

  satisfaction of any claims related to the Intermedia Intercompany

---

[8] On September 15, 2003, the Debtors announced that, based upon negotiations among
representatives of the Intermedia Preferred Stock Interests, the Creditors' Committee and
the Debtors, an additional $29 million in cash would be transferred to Intermedia to
provide a 5 percent recovery to holders of Intermedia Preferred Stock Interests. As a
result, the objection filed by OZ Management, L.L.C. and OZF Management L.P.
(together, "Och-Ziff") – a holder of Intermedia Preferred Interests – was withdrawn.

Note. (9/16/03 Tr. at 82; Notice of Amendment to Debtors'

Second Amended Plan of Reorganization, Docket No. 9004.)

Pursuant to the Plan, the Intermedia Settlement Consideration will

be distributed to holders of Intermedia Senior Debt Claims (for an

estimated recovery of 93.5%), and Intermedia Subordinated Debt

Claims (for an estimated recovery of 46.4%). (Disclosure

Statement at 43; Plan §§ 4.11-4.15; Notice of Amendments to

Debtors' Second Amended Plan of Reorganization, Docket No.

9004.) In addition, the WorldCom Debtors will fund the

distributions under the Plan to holders of allowed Intermedia

General Unsecured Claims (for an estimated recovery of 83.2%).

(9/16/03 Tr. at 90, 96.)

• Bank Settlement. This is a settlement with the Ad Hoc Bank

Committee of all issues relating to (i) the claims of twenty-five

institutional lenders[9] (the "Banks") arising under (a) the $2.65

billion 364-day revolving credit facility dated as of June 8, 2001

(the "364-Day Facility"), between WorldCom, Inc., as borrower,

and the Banks, as lenders and (b) the $1.6 billion revolving credit

---

[9] The institutional lenders include ABN Amro Bank, N.V., Allfirst Bank, Arab Bank
PLC, Banca de Roma S.P.A., Banco Bilbao Vizcaya Argentaria, S.A., The Bank of Nova
Scotia, The Bank of Tokyo-Mitsubishi, Ltd., New York Branch, Bank One, NA,
Bayerische Landesbank, New York Branch, BNP Paribas, Deutsche Bank AG, New York
Branch, Fleet National Bank, Fortis Capital Corp., The Governor & Company of the
Bank of Scotland, Lloyds TSB Bank PLC, Mizuho Corporate Bank, Ltd., Norddeutsche
Landesbank Girozentrale, New York Branch, The Royal Bank of Scotland PLC, New
York Branch, UFJ Bank Limited, New York Branch, Wells Fargo Bank, National
Association, Westdeutsche Landesbank Girozentrale, New York Branch and Westpac
Banking Corporation.

facility (the "Revolving Credit Facility"), dated as of June 8, 2001,

between WorldCom, Inc., as borrower and certain of the Banks, as

lenders and (ii) any and all causes of action that the Banks have

against the Debtors, the Reorganized Debtors, or any of their

respective current or former officers or directors relating to or

arising from the 364-Day Facility and the Revolving Credit

Facility, including without limitation, the Constructive Trust

Action and the Maryland Action (as defined below) (the "Bank

Settlement"). Pursuant to the Bank Settlement, under the Plan, the

Banks (whose claims are classified in Class 3A) will receive a pro

rata share of New Notes of the reorganized Debtors in the

aggregate principal amount of $75,000,000. Distribution of the

New Notes pursuant to the Bank Settlement is contingent upon the

Banks dismissing the Constructive Trust Action and obtaining

from the Banks party to the Maryland Action (the "MD Banks") a

dismissal with prejudice of the Maryland Action. [10]

- MCIC Settlement. This is a settlement with the Ad Hoc

  Committee of MCIC Noteholders of all issues relating to the

  defenses of the holders of Senior MCIC Notes to the substantive

  consolidation of the WorldCom Debtors (the "MCIC Settlement").

  Pursuant to the MCIC Settlement, the holders of MCIC Senior

  Debt Claims will receive a recovery under the Plan on the principal

---

[10] The Banks have agreed to pay to the MD Banks approximately $15 million in order to obtain the dismissal of the Maryland Action. First Supplement at 2.

amount of their outstanding claims equal to 80 cents on the dollar,
(9/15/03 Tr. at 216-27; Plan § 5.06(c)), which recovery is reduced
to 79.2% after giving effect to additional proposed settlements
reached in these cases.  (Second Amended Plan, Docket No. 8900.)
(9/15/03 Tr. at 213-15; Disclosure Statement, at 41-49; Supplement to Disclosure
Statement, at 1-4.)

The Settlements embodied in the Plan reflect the culmination of extensive, good
faith arm's length negotiations with the Covered Parties, the major economic parties in
interest, and are based upon analyses of the issues undertaken by the Debtors' and the
Creditors' Committee's professionals and analysts, and by the professionals for other
parties in interest.  (9/15/03 Tr., testimony of Frank Savage.)

**(i) The Intermedia Settlement**

On July 1, 2001, WorldCom, Inc. consummated the acquisition (the "Intermedia
Merger") of Intermedia Communications, Inc. ("Intermedia").  (*See* Debtors' Exs. 304-
06.)  WorldCom, Inc. acquired Intermedia for approximately $12 billion in value,
including cash, a note, stock and the assumption of long-term debt, pursuant to the
merger of a wholly-owned subsidiary of WorldCom, Inc. with and into Intermedia.  (*See*
Debtors' Exs. 304-06 and 318.)

In connection with the Intermedia Merger, stockholders of Intermedia received
one share of WorldCom group stock (57.1 million WorldCom group shares in the
aggregate) and 1/25th of a share of MCI group stock (or 2.3 million MCI group shares in
the aggregate) for each share of Intermedia common stock they owned.  Holders of
Intermedia preferred stock, other than Intermedia's 13.5% Series B Redeemable

34

Exchangeable Preferred Stock due 2009, received in exchange for their Series B

securities one share of a class or series of WorldCom, Inc. preferred stock, having terms

substantially identical to the exchanged Series B securities. (*See* Debtors' Exs. 304-06

and 318.)

To consummate the Intermedia Merger, WorldCom, Inc. created and capitalized

Wildcat Acquisition Corp. ("Wildcat"), a wholly-owned subsidiary of WorldCom, Inc.

Specifically, WorldCom, Inc. issued to WildCat a note, due June 15, 2009 in the

aggregate principal amount of $7,074,929,250, bearing interest at the rate of 7.69% per

annum, payable semiannually (the "Intermedia Intercompany Note") and paid to Wildcat

$70,750 in cash in exchange for shares of Wildcat Junior Preferred Stock, par value $1.00

per share, having an aggregate liquidation preference of $7,075,000,000. Pursuant to the

merger agreement, Wildcat was then merged with and into Intermedia, resulting in (i) the

shares of Wildcat Junior Preferred Stock becoming shares of Intermedia Junior Preferred

Stock and (ii) the transfer of the cash and Intermedia Intercompany Note to Intermedia.

(*See* Debtors' Exs. 304-06 and 309.)

The issuance and transfer of the Intermedia Intercompany Note enabled

Intermedia to remain in compliance with the indenture covenants contained in its

outstanding bond debt, including certain capitalization requirements (Creditors'

Committee's Ex. 4.)

Following the Intermedia Merger and until the Commencement Date, WorldCom,

Inc. recorded up to $1,390,000,000 in prepayments on the Intermedia Intercompany Note

and Intermedia recorded approximately $434,592,000 in interest payments. (Transcript

of hearing held on September 16, 2003 ("9/16/03 Tr.") at 75-77; Creditors' Committee's